1           **IN THE UNITED STATES DISTRICT COURT**
2           **EASTERN DISTRICT OF NORTH CAROLINA**
                  **WESTERN DIVISION**
3

4  **UNITED STATES OF AMERICA,**      )
                            )
5                            )
                            ) Case No.
6                            ) 5:14-CR-00126-FL-1
                            )
7  **KEYONA TENEA SHEARS,**           )
              **Defendant.**       )
8
  _____
9

10                   **SENTENCING HEARING**
       **BEFORE DISTRICT JUDGE LOUISE WOOD FLANAGAN**
11          **JANUARY 6, 2016; 10:54 A.M.**
            **NEW BERN, NORTH CAROLINA**
12  _____

13  **FOR THE GOVERNMENT:**

14  Jason M. Kellhofer
     U.S. Attorney's Office
15  310 New Bern Avenue, Suite 800
     Raleigh, North Carolina  27601-1461

16  **FOR THE DEFENDANT:**

17  Thomas Reston Wilson
     Greene & Wilson, P.A.
18  P.O. Box 1676
     401 Middle Street
19  New Bern, North Carolina  28563

20  PROBATION OFFICER:  Gabe Hardison

21        Proceedings recorded by mechanical stenography,
     transcript produced by computer.
22  _____

23          **DAVID J. COLLIER, RMR, CRR**
           FEDERAL OFFICIAL COURT REPORTER
24             413 MIDDLE STREET
            NEW BERN, NC  28560
25

<pre>
 1                    P R O C E E D I N G S
 2                     - - - o0o - - -
 3           THE COURT:  All right.  Ms. Shears, my name is
 4   Judge Flanagan and this is the time the Court has set aside to
 5   sentence you.
 6                Have you had enough time to get ready for this day?
 7           THE DEFENDANT:  Yes, Your Honor.
 8           THE COURT:  Have you read the presentence report?
 9           THE DEFENDANT:  Yes.
10           THE COURT:  All right.  You made materially false
11   statements.  I'm familiar with the offense conduct.  I'm
12   familiar with your background and your history.  You've done
13   very well in school and it really defies logic what you've gone
14   and done here, lying to the FBI, given the opportunity to get
15   your statement correct, you disclaimed that.  I think there's
16   a lot of mixed emotions swirling around and some mental health
17   issues that are located in this case, and it's a sad day for
18   you and for your family.
19                I'm familiar with your family background, your
20   health.  Your education is also noted.  You've done very well
21   in school, you've done very well in your extracurriculars, and
22   you really have, aside from this event, a very promising
23   future, and I think you still have a promising future, but
24   you've got to pay your debt.  I've got to fashion a sentence
25   that discourages this type of conduct, that promotes respect
</pre>

1  for the law, that protects the public.  Our war against

2  terrorism is so significant to the protection of the public, so

3  draining of the money in our Federal coffers, so distracting to

4  those who would seek to contribute to society and live

5  productive and normal and non-fearful lives.

6          Now, the advice I receive under the sentencing

7  guidelines is a sentence of 96 months.  Now, were it not for

8  the fact that you've been charged in the way you've been

9  charged, which means I can't sentence you to more than eight

10  years in prison, I would be telling you today, Ms. Shears, that

11  you face 151 to 188 months.  Your behavior can be supervised

12  for up to three years.  Under the guidelines you're not

13  eligible for probation, by statute you are, one to five years.

14  The fine could be as much as a quarter of a million dollars,

15  the guidelines suggest a range of between 15,000 to 150,000,

16  and there's a $100 special assessment.

17          I've got your motion for a downward variance, kind of

18  walked the line as to whether it really needed to be sealed,

19  but in deference to your concerns I did allow the motion to

20  seal.  There's a plea agreement here.

21          All right.  Mr. Wilson, I'll invite your client to be

22  seated and I'll focus on what you have to say.  What would you

23  like to say?

24          MR. WILSON:  Thank you, Judge.

25          And again, in light of the initial discovery and

1  everything in the case being under a protective order, that was

2  part of my decision to seal the sentencing memorandum, but

3  thank you for that, and thank you for that consideration.

4         Judge, you hit on it, I think, in your initial

5  summary with Ms. Shears, or Keyona, as I call her.  You know,

6  she's someone that has exhibited a life of nothing but success.

7  She showed up at my office today with a binder of her academic

8  achievement awards, from the Girl Scouts to honor roll to

9  continual Dean's list, for being an above average student.

10        She has worked.  She has a personality, I think you

11  can probably glean from those character statements, that is one

12  of just a good heart, that is someone that is there for

13  someone.

14        I'd be remiss if I did not mention, Your Honor, in

15  the courtroom in the back is her mother, her maternal

16  grandmother, and then I believe cousins, one of which just got

17  off work and drove straight here from Raleigh, so we appreciate

18  them being here.

19        THE COURT:  Well, thank goodness the family had the

20  good sense to turn down the suitor who came to them seeking her

21  hand in marriage.

22        MR. WILSON:  And, Judge, that's the kind of family

23  they are, raised Southern Baptist, traditional, a strong

24  matriarch, and I think the crux of this case, or a large part

25  of it, is just a number of forces coming together at a very

1   vulnerable time in her life, and she fully -- at a time when

2   her identity was in question, she had just moved out of the

3   house, had gone from Wake Tech, where she had initially met

4   Mr. Brown, to University of Charlotte, North Carolina at

5   Charlotte, and literally within the first semester she's there

6   she converts to Islam.

7           I've learned a lot from Mr. Kellhofer on this case,

8   he has a lot more experience in these matters than me, but kind

9   of in conversing with him and my own reading, that conversion

10  I think particularly at that age isn't testing the waters, it

11  tends to be extreme, it tends -- the pendulum tends to swing

12  fast, and particularly with someone, I think, that is

13  academically successful and as many achievements as she's had,

14  she has lived somewhat of a sheltered and immature life and

15  lacks maturity, lack of maturity in this decision making

16  process and in some basis lack of maturity since.

17          Judge, I've gotten to know her now over about the

18  last 18 months in this case.  She is just someone that I truly

19  believe this is an aberration in her life and she fully is

20  going to -- is paying for it and will pay for it in the future

21  and she acknowledges and respects that, Judge, but she -- and

22  it's taken a while, I think that's some of the Government's

23  reservation with her in this case, is to really understand what

24  this case is to her.

25          I say that because it was -- her relationship with

1   Mr. Brown in this case went through two phases.  They initially

2   dated at Wake Tech in Raleigh in the same town and with a

3   normal, you know, human relationship, talking face-to-face,

4   talking on the phone.  After she converts to Islam, after he

5   converts to Islam, and they reconnect, they never, even over

6   the course of the whole case and the offense conduct alleged in

7   the presentence report, had even a voice phone call, it is a

8   true virtual relationship in a virtual reality of idealism

9   I think they created with each other, that Keyona explored on

10  her own, aside from Mr. Brown, on the internet, in essentially

11  a dark double life of her own aspiration, but that she by her

12  own admission knew she was wrong, and she knew she was wrong

13  because she doesn't tell any of these folks, they had no idea

14  what was going on.  They knew when this guy showed up at her

15  door that he was not the right man for her, but I don't think

16  they had a real clue as to what Keyona was really exploring.

17          I think, Judge, that speaks to two things.  One,

18  Keyona herself knew it was wrong; and two, she has a support

19  network and a foundational family network that knows better and

20  that is going to help her going forward and be cognizant of

21  this.

22          I think one of the, I thought, really important

23  statements in the character statements submitted was by Sierra

24  Smith, her cousin, who now lives in Florida, but Sierra said:

25  We didn't know how to protect her.  I definitely did not expect

1   people to take advantage of her innocence.  I wish I could

2   protect her, because I know the type of person that she is and

3   that this is not something that she should be involved with,

4   but that we were not raised -- we were not Muslim, we didn't

5   know to be looking for this, particularly the extremism.

6           I think in her own mind, Judge, and I don't know

7   this, but in talking to her, you know, this pendulum swing to

8   extremism was really something out of a belief of, whether it

9   was misguided or not, her understanding of some of the

10  geopolitical situation in Syria at that time against

11  Bashar Assad.  That, obviously, landscape is completely

12  different today than it was in 2013, but I do think that was

13  some of -- some of what her misguided mindset was.

14          Judge, we'd ask you to consider first a departure,

15  she has no criminal history, and we'd ask you to remove that

16  aspect of the guidelines, it doesn't help her tremendously, it

17  moves -- it would move her from being a Level VI criminal

18  history, as Section 3A1.4 recommends, that only takes her to 87

19  to 108 months, but that is something that I would ask you to

20  consider, to start there, start at 87 months, and for a

21  variance down to probation.

22          Judge, she has been on pretrial release, she

23  initially turned herself in in Charlotte, or was arrested in

24  Charlotte, released there on I think a personal recognizance

25  bond, moved back to Raleigh, back home, has been a model

1    pretrial release, pre-sentencing release supervisee.  She's

2    formed relationships with all of the probation officers that

3    have dealt in her case, and I believe they -- and I've spoken

4    with them myself -- have tremendous confidence in her and her

5    ability to follow the terms and conditions that this Court

6    might impose, whatever they may be.

7         I do think mental health -- when I first got this

8    case I talked to Mr. Kellhofer about, you know, locating some

9    sort of psychologist or someone that had an expertise in

10   deradicalization or in dealing with that, and the one I found

11   was conflicted out dealing in other cases I think in this

12   district.

13        THE COURT:  Who was that?

14        MR. WILSON:  And obviously related to the scope --

15   I think it was the man actually working -- or formerly working

16   in Mr. Brown's case.

17        THE COURT:  Okay.

18        MR. WILSON:  And so, Judge, some of the -- I would

19   like to have that to present to you, but, you know, Keyona

20   wrote a statement that is attached to our sentencing memorandum

21   that I think the most important part of that statement is that

22   she through this process has deconstructed her understanding of

23   Islam and rebuilt it again.  She did not shed it, but I will

24   tell Your Honor today is the first day that we have met, other

25   than Saturday when I met with her and her family, that she is

1   not wearing a head scarf, that I've see her full face, and that

2   was something I was going to recommend to her, frankly, but I

3   didn't need to, it was a decision she made to present herself

4   fully to the Court behind no -- no screen.

5          Judge, I know she wants to speak to the Court and I

6   ask that opportunity for her and encourage Your Honor to

7   question her, because I think she really wants to explain

8   herself.

9          THE COURT:  All right.  Thank you very much,

10  Mr. Wilson.

11         I'm sorry.  Yes.

12         THE DEFENDANT:  Firstly, Your Honor, I would like to

13  really take responsibility for what I've done.  From the time

14  that FBI agents came to my home, I knew that I had to accept

15  responsibility, but I was immature enough to lie because I knew

16  the things that I had going on in my life at that time that if

17  I told the truth would impact -- I didn't live on my own, I

18  shared a home with someone else, so to me, by telling the truth

19  I would risk my roommate being homeless.  I was in the last

20  year of school.  I wanted to achieve a degree because I would

21  be the first in my family to do that.  So those are the reasons

22  why I immaturely chose to lie.

23         When I got arrested in June, I knew from that day

24  there would be no trial, I would right my wrong by pleading

25  guilty, by complying if a plea agreement was given to me, and

it was.

I regret the lie that I made, not just for myself, because I'm an American, I know right from wrong, I know what my country stands for. I regret my mistake due to my family. Not only has it impacted me, but it's also impacted my mother and my grandmother who raised me to be much different.

I'm a very emotional person and it stems from emotional problems. The biggest impact of this situation was after my father passed away. For the 24 years that I've been living, I've been striving to have the perfect relationship with my dad and then he passed away. Avin was in my life at that time. I tried my hardest to fill the void, and in those three to six months, three months talking to Avin and in the months prior to talking to him, I kept trying to fill that void of my dad. Marriage was my only way, I thought, but I was wrong.

Being on supervised provision has been my rehabilitation, because each day I have to live my life facing my family and seeing the disappointment in their eyes, working with people who don't even know what's going on and see me as a positive truthful person, knowing that I had a demon inside of me during that time that I was talking to Avin, and it pains me. It pains me because I know I'm not the person that I was, and it pains me that that was the mistake that changed my life for the worse, and it pains me to have my grandmother, who is

1  sick, that I'm taking care of, not even knowing what's going

2  on, and I already watch her grieve over my deceased dad and

3  she's trying to fill a void as well.

4          I just taking 100 percent responsibility for what I

5  did, and I know that I have to take responsibility because it's

6  the right thing to do.  I'm very intelligent, there's no doubt

7  about that, but because I'm very emotional, it made me stupid,

8  stupid for three months plus, stupid to think that I could lie

9  to Government officials who know everything and get away with

10  it, but because I knew that I was stupid, I tried to make my

11  amends.  I'm trying to make my amends, and I only see my way to

12  doing that by continuing to be out on probation, because by

13  working, I'm rehabilitating myself, I'm reeducating not only

14  myself about Islam but my peers.

15          I thought that in one year of being Muslim I knew

16  everything, and I don't.  I thought, okay, I'm praying five

17  times a day, I'm going to the Mosque, okay, I can handle the

18  sociopolitical aspect of Islam.  I was wrong.  I wasn't being

19  Muslim for me, Your Honor, I was being Muslim for other people.

20  Other people were telling me what the right type of Muslim was,

21  and I failed, and I succumbed to that, and on this day and

22  since I've been arrested I've been trying to change myself, to

23  relearn Islam and find that peace that I thought I had found

24  way before I converted.

25          THE COURT:  Okay.  And from the Government,

1    Mr. Kellhofer?

2              MR. KELLHOFER:  Yes, Your Honor.

3              Your Honor, I do have a few exhibits I'd like to

4    present to the Court, if I may approach.

5              THE COURT:  Um-hum.  Mr. Wilson, has he seen those?

6              MR. WILSON:  I got these last night, yes, Your Honor.

7              MR. KELLHOFER:  A few exhibits, Government 1 through

8    7, and I'm providing a copy of the originals as well as a

9    working copy for the Court.

10             Your Honor, I think those will briefly be of

11   assistance in giving the Court a full picture in this case.

12   And let me preface by saying, Your Honor, that often I think as

13   a prosecutor sentencing is somewhat of an easy endeavor, that

14   is the people have shown themselves to be very deserving of

15   what's about to happen.  This has, in all honesty and candidly,

16   been a very difficult matter for the Government to consider how

17   to advise this Court based on the information we have and

18   what's occurred.  And to be blunt, when this case came before

19   the Government, as you've seen through the PSR, it was not

20   happenstance, but as a result of the investigation into

21   Avin Brown.  Avin Brown made the statement to one of our

22   sources that he had a fiancee who additionally supported jihad,

23   and that's where then this investigation sort of branched into

24   that.

25             Upon first viewing the information that came to us,

this was an instance of where, at least from the prosecutor's
view and I believe the entire investigation, it was a true hope
that Miss Shears was not involved, that Miss Shears -- that
Avin Brown was just speaking out of turn or exaggerating,
because this is somewhat of an instance of almost feeling like
one of the good guys went to the bad side.  This was an
individual at college who was a leader within the Muslim area,
although young and although new to the faith, and those are
important in this day and age, and it turned out that
unfortunately Ms. Shears had jumped wholeheartedly into the
extremist ideology.

The facts that I think are somewhat important to
bring out for your consideration and to flesh out a little bit
of the PSR, the prosecution -- or Government Exhibit 1,
Your Honor, is simply an e-mail that is an attachment and it's
a publication of the role of women in fighting the enemies, and
that's what was passed from Avin Brown to Miss Shears in
December of 2013, and it's just emblematic of -- when there's
statements like "we discussed these things," this is what it
was, this is what the investigation showed, that this is what
they were discussing, the appropriateness of engaging in this
violence and the appropriateness of females in particular as
well.  That obviously had us very disturbed, and I agree very
much with 99 percent of what was just said, to be honest;
however, it's just not the whole picture, and I think looking

1  at Mr. Brown or having the perception of Mr. Brown as being

2  this sole influencing factor just is not entirely accurate.

3      Exhibit 2 is essentially when they broke up, if you

4  will, Miss Shears and Mr. Brown, and that was in January of

5  2014, and her letter to him states, Your Honor, that, yes,

6  she's looking to potentially go a different route because she

7  wants to complete school and she's fearful of going to Syria at

8  the moment and she struggles with that because she loves him.

9  She goes on to say:  "Because I love you for Allah's sake, I

10 want you to worry less about me and more about achieving

11 martyrdom.  Bro, you have the opportunity to answer the call of

12 Allah, to achieve true brotherhood, to defend the Ummah of

13 Muhammad, and at the end of it all, to die for the sake of

14 Allah.  That's more beloved than being married and having a

15 child."  So there was constant encouragement from her to him.

16     One of the benefits of this plea agreement,

17 Your Honor, is that we're not bringing additional charges.

18 I firmly believe that the Government could have charged

19 Miss Shears in the conspiracy that involved Avin Brown and

20 Mr. Jordan.  This is a letter that occurred in January of 2014,

21 and there's a host of other text communications between them.

22     Additionally, limiting it solely to Mr. Brown is not

23 entirely accurate.  The Prosecution's Exhibits 3, 4, 5 and 6

24 are emblematic of what she was posting on Instagram, albeit

25 through what she assumed would be an anonymous moniker, but

1  this was not to Avin Brown, this was to the public in general,

2  and you can see there's comments, and as Your Honor is familiar

3  with these types of social networks, that's the entire purpose,

4  it's propaganda multiplying propaganda, and I do believe that

5  a lot of that propaganda did target someone like Miss Shears,

6  and it was effective, and then she became within that cycle

7  putting it out, and this just didn't involve only Mr. Brown.

8  As you can see in Government Exhibit 4:  "As a group of women

9  we got together and decided to support our mujahideen brothers

10  at the front lines."  That's the discussions between her and

11  him, moving into her presenting it to others.

12          Additionally, limiting this solely to -- or leaving

13  any impression that -- I'm not saying it was intentionally

14  done, but I do think that the emotion and the letter of

15  acceptance of responsibility does leave a little bit of a

16  misimpression that this was solely I had a problem with

17  Bashar al-Assad and the atrocities there.  That's not what this

18  is.  This is a much bigger movement.  And perhaps there was a

19  failure to fully recognize what all that movement entailed, but

20  this was not solely a view of Syria.  In fact, in regard to our

21  ability to have charged her with the conspiracy, she did

22  provide money to the individual that was -- the source online

23  that was communicating with Avin Brown.

24          When she communicated with these individuals, she

25  believed they were in Yemen and they were members of Al-Qaeda

1  in the Arabian peninsula, AQAP, not in Syria fighting

2  Bashar al-Assad.  So the depth of what she jumped into was

3  a little broader than I think just the way it came out through

4  the presentation of what was filed by the defense; again, not

5  necessarily intentionally, but again, my effort is to provide

6  Your Honor with a little more context into why the

7  Government -- and why I think we're in a situation where

8  admittedly this is a 1001 offense, and 1001 offenses often are,

9  well, hey, you just lied to the FBI.  Well, it's a little

10  bigger in context here and it was highly material.

11          In this instance -- and I would note those Instagram

12  photos and things, those are up through into February.  It's my

13  belief that her being confronted and questioned in March, and

14  I think the evidence supports that, is what stopped her

15  trajectory.  It was not an internal stop.  I think very

16  fortunately she was questioned.  But on that very day -- well,

17  first of all, two things:  One, in January Avin Brown had

18  texted her and told her, I plan to leave in March, try to get

19  into Syria; and she said, well, when you do, let me know,

20  you know, I'll help you make it.  Then on March -- naturally on

21  the day he was leaving, he texted and told her, I'm leaving,

22  and if you don't hear from me in six days it means they got me,

23  I've been arrested.  She responds with "you're in my prayers."

24          I feel like the Government here has made every effort

25  to address exactly what it is Miss Shears did and even in its

charging understand both her age and the factors that existed
in her life, but I will say one of the things that has been of
most concern to me, because I feel like throughout this process
the Government has made an effort to give her the benefit of
the doubt and I wanted to give her the benefit of the doubt,
and I think one of the reasons I stand here saying this is hard
is because it's an instance where the benefit of the doubt has
been withdrawn due to her own actions, and that's just such a
shame.

          In November of -- she was arrested in June, and then
in November, months later, after all of this, in an effort --
now, she had signed a plea agreement, and I believe she made
efforts, she signed an information and things moved forward and
arraignment was put off for quite some time; however, it came
to our attention that she had during that time sent what is
Government Exhibit 7, and rather than notifying the FBI that,
hey, I saw somebody online doing essentially or having the
ideology and the thoughts that I had months ago, rather than
providing that to the Government and saying, hey, here is this,
knowing it could help her, and obviously knowing the situation
she's in, she sends an e-mail that says there's fake Muslims
seeking to bring down sincere Muslims.  So I find it very
disconcerting that she felt that that was a sincere Muslim.
And then additionally she tells him to keep a low profile if
his goal is to be a mujahideen, to keep it to himself, and at

1  the end may Allah protect you and grant you that which you

2  seek.

3          To be candid, Your Honor, I'm not going to say that

4  this is an individual who is not -- has not recognized the

5  flaws in the ideology that she had jumped into, I think she

6  has, but this highly concerns me, and I think a portion of this

7  was she's an altruistic person, I think a part of this,

8  honestly, was she was just trying to keep somebody else from

9  getting in trouble, but it is such a failure to appreciate both

10 what she's done and how she's going to operate moving forward.

11         All of that being said, Your Honor, the Government

12 does oppose a variance; however, I will say if Your Honor is

13 considering a variance, I understand why, but the Government

14 maintains that given the crime here, the full context, that a

15 period -- a substantial period of confinement is appropriate.

16         THE COURT:  So you oppose, first, the motion for

17 downward departure?

18         MR. KELLHOFER:  I do, Your Honor.

19         THE COURT:  And oppose the motion for variance?

20         MR. KELLHOFER:  Yes, Your Honor, but I will say that

21 if the Government -- if Your Honor is considering a downward

22 variance, I fully disagree with probation, and --

23         THE COURT:  Well, there's a lot between the two.

24         So you believe a sentence of 96 months accomplishes

25 the purposes of sentencing?

1      MR. KELLHOFER:  I think that the defense's

2 recognition of -- I believe it was 87 months, if the --

3      THE COURT:  Yes.  You're right.  If successful in his

4 motion for a downward departure and the Court drops the

5 Criminal History Category to a I, the advice I would receive

6 under the sentencing guidelines is 87 to 108 months.

7      MR. KELLHOFER:  Yes, Your Honor.  If the Court were

8 to accept that line of argument, then in that instance the

9 Government would state that 87 months is an appropriate

10 sentence, Your Honor.

11      THE COURT:  Okay.  All right.

12      Did you want to respond briefly?

13      MR. WILSON:  Judge, just a few things I failed in my

14 first kind of recitation on her behalf and then I can respond.

15      She is currently -- and I mentioned this in the

16 sentencing memorandum, she's the primary caregiver for her

17 paternal grandmother, who has essentially gone to Hospice care

18 for COPD and other issues, and Probation is aware of that,

19 she's moved from living with her mother and maternal

20 grandmother to provide that care and is doing so.

21      So, Judge, in light of that, I would ask any active

22 sentence Your Honor considers, that she would be given the

23 opportunity to self-report to wind that down appropriately and

24 I think transfer power of attorney and do some things in that

25 regard.

1    Judge, one thing that Miss Shears spoke of during her
2    allocution to the Court is -- and I think it's stark in this
3    case, and Mr. Kellhofer hit on it as well, I don't know if she
4    knew -- she didn't know, I think it's clear, all the
5    ramifications of what this posting meant, what the ideology
6    meant, what it meant over there, what -- the issues of Syria
7    versus the issues of Yemen.  She -- and I hope, because I tried
8    to not specifically imply that Mr. Brown singly led her down
9    this road, I mean she converted to Islam first, she I think was
10   the far more academic -- had a far more academic understanding
11   of it, and they conversed openly about it, so to the extent
12   that it was perceived I misled the Court, I did not intend to.
13       But, Judge, her father died on October 3rd.  I think
14   Avin starts to ask her to -- saying he has a contact that would
15   like her to send money both to the widows and the children in
16   Syria but also the fighters, and she does that, and then on
17   October 3rd her father dies.  On October 4th is when really the
18   chain of e-mails and communications with the then undercover
19   source, you know, I think sheds some light into her, that
20   she's, you know, found this one man, he's going to give --
21   you know, Mr. Brown is going to take her to the afterlife by
22   being martyred.  Her father is dead and she has no male anchor
23   and just real loss of identity that I think was already in
24   place, but it really spiraled out at that point, and I think
25   it's stark that that occurs really smack dab in the preliminary

conduct that led to that March 19th, 2014 date when she lied to the FBI.

Judge, as to the November, 2014 e-mail, when, to be perfectly frank, we met with the FBI and I was presented that, my heart absolutely sunk. At that point we had tried to do everything we could do to line up cooperation, admittedly it had started the month before and Keyona was bombarded with a number of obligations and setting up certain things that she readily wanted to do and we committed to do as part of her -- part of the plea agreement and our obligations thereunder, and, Judge, I've talked to Keyona about it, her explanation, which I think I believe, but I think she struggles with it too because it was at a time where she -- I think her rationale in her head, whether it was being altruistic and just trying to protect someone or her true rationale in her head as she's articulated it to me was simply, you know, I got this, I was setting up all these, you know, faux personalities on these various forms of social media and I got this and I wanted to start building my rapport.

Again, you know, that being said, when I was handed that, my heart sunk for her, but I would ask you, Judge, if but for that you would consider -- you know, but for that you would have considered some probationary sentence, then I would ask in light of that that you not go to the extreme end of, you know, eight years, seven years, five years. I mean, this is someone

1   that has not spent a day in custody, someone that knows nothing

2   but work, school, family, and would like to get back to that,

3   and I think an extensive amount of probation -- I thought the

4   max was five years, maybe it's three, but --

5           THE COURT:  Well, the probation officer has written

6   three.  Is that a mistake?  Is it five years?

7           MR. HARDISON:  Probation is one to five.

8           THE COURT:  I'm sorry.  Were we talking about

9   supervised release or --

10          MR. WILSON:  Probation.

11          THE COURT:  Probation is one to five years, yes.

12          MR. WILSON:  Then I might have misread, but I mean

13  that, on what she has been through, that she will be a felon

14  for the rest of her life, that she will never travel overseas

15  probably for the rest of her life, that she will not do a lot

16  of things that someone otherwise in her situation would do,

17  travel abroad, see the world, fill what is already a wonderful

18  and full mind and thoughtful mind with new experiences,

19  you know, she is going to be limited, and I think probation

20  could include continual mental health treatment and

21  continued -- to the extent we could find it, Mr. Hardison, but

22  some sort of deradicalization program to monitor her.  I mean

23  that I think is going to be real value to both our country, to

24  her sentence, to her, and still respects the tenets of 3553(a)

25  and the four purposes of punishment and sentencing.

1    Judge, you know, I don't, to be frank, envy the seat

2    you're in, because I think it is -- it is a very tough case.

3    THE COURT:  Yeah, it is.  I see somebody who has

4    lived a sheltered, constrained life full of familial

5    obligations, who has this keen desire for approval and

6    validation, which is okay if it drives you to do well in

7    school, bring good grades home to your parents, which she did,

8    to want to be the leader of the clubs, to want to present

9    yourself as the face of your school and act as, you know, a

10   contact for interested persons, those are all good things, but

11   what is clear to me is this mental part of her, this part of

12   her personality that's just driven to seek approval and

13   validation, when she got away from home into a new lifestyle

14   really got unleashed such that she felt in her conversion that

15   she could establish herself as a leader and gain the approval

16   and validation of people she perceived as very concerned about

17   current affairs, very understanding of what was right and what

18   was wrong, and she kept walking further into that dark world.

19   She's young, she's impressionable, she's looking for

20   something, she's trying to establish herself, she wants to be

21   seen as someone knowledgeable, and what frightens me the most

22   is how much everything I've said really applies to people, so

23   many of our youth, and that's the frightening thing about this

24   case.

25   I don't think you're unusual.  I think many kids have

sheltered lives who really covet the approval of their parents
and their grandparents, who are looking to establish themselves
and who fall into this abyss thinking that they can suddenly be
seen as a savior, and a lot of people go into very legitimate
nonprofits and very recognized political causes, and just so
many people, so many young people are going into this,
you know, violent jihad movement and getting they think
something from sending through PayPal money and leading others
down this path.  You're just so lucky you got caught, because
I think you'd be out there now, that's very very frightening,
with your proclivities, you would be on your way.

Now, you can turn it all around, and you're doing
things to do that now, and you've got family behind you that
supports you and you've got a great brain and I've got to say
that's not always the case standing where you're standing, that
I get the opportunity to say that and to recognize someone's
accomplishments the way I can recognize yours and to say what a
promising future you have, which you do, but let a message be
sent, let a message be sent in this case to others like you and
let you when you get out of prison, because you are going to
serve a term in prison, let you be somebody that helps others
the way you profess to want to not do this.  You could be a
very powerful voice for that.  You really could help a lot of
people, because I don't see -- I don't see what's going on
overseas ending any time soon, sadly, I don't think anybody

does.

So let me read about you in the papers, let me do that, let me recognize that this really was a turning point and see the evidence of it in the future. Let everyone who is gathered here see that. Live that kind of life, where you contribute productively in so many ways, a piece of which might be discouraging other young Keyonas and other young women and men. I think you probably had some influence on Mr. Brown too. I mean, I don't buy that you got led down that road. I think you said some things to him and to others that helped to fuel those fires.

Now, I don't think you're a Level VI. You're a Level I. That motion for a downward departure is granted. A Level VI substantially over-represents your likelihood of committing further crimes, and as dangerous as this was, it over-represents your dangerous.

So I now have advice that you should be sentenced between 87 to 108 months, and I don't think that accomplishes the purposes of sentencing, nor do I think a probationary sentence accomplishes the purposes of sentencing.

As I've said, we've got to discourage this type of conduct, we've got to protect the public, we've got to promote respect for the law, and when the FBI knocks on someone's door now is not the time to think you're smarter than them, now is not the time to think you have to lie to keep your lease

1   intact, it's the time to be frank and forthcoming.

2          I don't know what to make of Exhibit Number 7.  It

3   fits into that personality profile that's been developed in the

4   record of you, again, wanting to express yourself as someone

5   with something valuable to say, a pearl of wisdom.  Whether you

6   were trying to kind of lay the groundwork for future work with

7   the Government, I don't know, I'm not going to -- I'm not going

8   to focus too much on that, but as I said, you have to go behind

9   bars, that's only fitting for what you've done, but I take into

10  consideration your history, your characteristics, as well as

11  the nature of the offense, I take into consideration all the

12  other factors, and I believe a sentence of 18 months

13  accomplishes the purposes of sentencing in this case.

14  I believe that's a sentence that's sufficient but not greater

15  than necessary.  That's also a variance.  So you've gotten a

16  downward departure and you've gotten a variance and you've

17  gotten a lot of favorable treatment in the way you were

18  charged, I think.

19          Think about how lucky you are and how much you can

20  accomplish.  Do what you're supposed to do in prison.  You can

21  take close to three months off the sentence yourself, all told,

22  by doing that.

23          I think you can self-report.  I'm going to give you

24  the ability to do that.  I'm going to give you a chance -- now,

25  you should have already done it and gotten somebody else to be

the power of attorney for your grandmother, and maybe you
already have, but I feel like you've got 45 days worth of
personal affairs to close down, get your business affairs in
order, make some plans for getting -- for what you're going to
do and how you're going to go forward when you get out of
prison.

I'm ordering that you not report sooner than 45 days.
Now, the downside of that is you're going to have to pay to get
wherever the Bureau of Prisons says to come.  The closest
women's prison is probably West Virginia, but I don't know
where they're going to send you.  Does that raise an issue for
you?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Okay.  Now, you're going to be on
supervised release for five years, and pursuant to the
plea agreement Count 2 is now dismissed.  Within three days of
getting out of prison you're going to report to your probation
officer.  If you break any law, possess a weapon or drugs
illegally while you're under supervised release, you'll be in
violation of the Court's judgment.

Now, sometimes I hear very good things about people
and I cut their supervised release terms down.  Let you be one
of those people, okay?  I don't think it's going to happen
early on though, you've got to prove yourself, and you do need
mental health treatment.  I'm recommending you for mental

1    health treatment in the Bureau of Prisons and I'm

2    recommending -- I'm requiring you to get mental health

3    treatment when you get out.

4            Now, I think some community service is going to be

5    appropriate, and I hope you'll think with your probation

6    officer about where to put your efforts and I hope you'll

7    choose wisely, I know your probation officer will help you, but

8    you've got to do 100 hours of community service while you're

9    out.  You'll cooperate in the collection of DNA, you'll provide

10   a urinalysis test within 15 days of getting out of prison and

11   at least two tests thereafter and a $100 special assessment.

12   I'm not going to impose a fine.  You don't have the ability to

13   pay a fine.

14           What do you want to do to make a living when you get

15   out of prison?

16           THE DEFENDANT:  I have my degree in public relations.

17   Being that I am a felon, I know that I must create my own

18   business.

19           THE COURT:  Well, no, I'm not going to say that.  I'm

20   not going to agree with you.  I think you need to be careful.

21   I quite often hear felons telling me they're going to create

22   their own business when they get out of prison, and I think, do

23   you have a business plan, do you understand the overhead, the

24   requirements that you maintain this, that and the other types

25   of insurance, handle your taxes.  You really probably need to

1  think about working for somebody else.  Don't think you know it

2  all.  You don't.  Learn from somebody else.  Put yourself in an

3  organization would be my strong recommendation.

4          Yes, you've made a mistake, you've made a really big

5  one.  Can you put it behind you?  Yes, you can.  And your

6  probation officer will be a lot of help to you, okay?  You can

7  do it, all right?  And I really hope you can.  You've got a lot

8  of talents, and unfortunately -- well, I think I've said

9  enough.

10         Anything else, Mr. Wilson?

11         MR. WILSON:  No, Your Honor, but just in light of

12 what you were just saying, I was reading last night, kind of

13 thinking about today, about a new term I had learned that I

14 thought Your Honor might like, but it's post-traumatic success,

15 about what happens after a situation like this with people like

16 Keyona who go on to do great things, and I think she is someone

17 that will fit into that category.

18         THE COURT:  Well, those are very nice words for her

19 to hear, I hadn't heard that term, but choose your friends

20 wisely, keep company carefully, that's going to be important.

21         Mr. Wilson, will you come forward and get the order

22 of self-surrender.

23         Mr. Kellhofer, anything further from the Government?

24         MR. KELLHOFER:  No, Your Honor, just thank you for

25 your considered judgment.

1          THE COURT:  Well, thank you for your efforts in this

2     case and for law enforcement's efforts.

3          Again, I think you're really fortunate.

4          Mr. Hardison?

5          MR. HARDISON:  May I address one thing?

6          THE COURT:  Yes.

7          MR. HARDISON:  Your Honor, I believe there was a

8     typographical error on page 3 of our recommendation.  The

9     maximum available supervised release available was three years

10    and not five.

11         THE COURT:  Oh, okay.  All right.  Well, she gets the

12    benefit of that.  Three years.  Thanks.

13         MR. HARDISON:  Okay.

14         MR. WILSON:  If I can approach, Your Honor.

15         THE COURT:  As your counsel approaches, I'll tell you

16    you have the right to appeal the conviction and the sentence.

17    You did enter into a plea agreement that has waivers in it of

18    your rights to appeal and these waivers are generally

19    enforceable, but if you believe they're not, you can present

20    your theory to the Court above, but you do need to move

21    quickly.  And the Government also has a right to appeal.

22    In your case you've got 14 days from the date the judgment goes

23    on the docket.  If you can't afford the costs of an appeal you

24    can apply for permission to appeal for free, and if you

25    request, the Clerk will fill out the appeal paperwork for you.

1          All right.  I'm going to also add a condition of

2    supervised release that the defendant provide after one year

3    kind of a self-assessment to the probation office after

4    one year of supervised release, kind of where she is in her

5    life, what she's learned, what she still needs to work on and

6    where she's headed, and I would like the probation office to

7    send that to me.  I'd like to read that as well.  All right?

8          We'll stand in recess.

9                         – – – – –

10         (Proceedings concluded at 11:46 a.m.)

11                        – – – – –

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

This is to certify that the foregoing transcript of proceedings taken in a sentencing hearing in the United States District Court is a true and accurate transcript of the proceedings taken by me in machine shorthand and transcribed by computer under my supervision, this the 13th day of January, 2016.


/S/ DAVID J. COLLIER


DAVID J. COLLIER
OFFICIAL COURT REPORTER